# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 7 |
| KEELEY AND GRABANSKI | ) | |
| LAND PARTNERSHIP, | ) | |
| Debtor. | ) | Bankruptcy No. 10-31482 |

---------------------------------------------

| | | |
|---|---|---|
| KIP M. KALER, TRUSTEE, | ) | |
| Plaintiff, | ) | Adversary No. 11-7021 |
| | ) | |
| v. | ) | |
| | ) | |
| LOUIE SLOMINSKI, | ) | |
| Defendant. | ) | |

---------------------------------------------

| | |
|---|---|
| LOUIE SLOMINSKI, | ) |
| Counter-Claimant, | ) |
| | ) |
| v. | ) |
| | ) |
| KIP M. KALER, TRUSTEE, | ) |
| Counter-Defendant. | ) |

## ORDER

Trial was held in this adversary case on January 24-26, 2012.   Plaintiff Kip

Kaler represented himself as Chapter 7 Trustee.   DeWayne Johnston represented

Defendant Louie Slominski.   Following trial, the Court took arguments and

post-trial briefing.   This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (M),

and (O).

## STATEMENT OF THE CASE

The Chapter 7 Trustee, Kip Kaler, brought this adversary case seeking to set aside a lease between Debtor Keeley and Grabanski Land Partnership (KGLP) and Defendant Louie Slominski.   KGLP and Slominski entered into the lease either immediately before or shortly after the filing of the involuntary Chapter 11 proceeding against KGLP.   Trustee seeks to avoid the lease as a fraudulent transfer or obligation under 11 U.S.C. § 548(a) if the transfer occurred pre-petition. Alternatively, if the lease was signed after the filing, Trustee seeks to avoid the lease under § 549 as an unauthorized post-petition transfer of an interest of Debtor.   The Court also heard arguments on what it construes to be a Motion by Trustee to Terminate the Lease for failure to make payment.   The Motion to Terminate the Lease was consolidated with the trial on the adversary.

Slominski asserts that the lease was formed pre-petition and cannot be set aside under §549.   He also asserts it was a valid, non-fraudulent, pre-petition obligation that cannot be avoided under § 548(a).   Slominski also argues that the lease cannot be terminated for failure to make payment because he provided the bulk of the lease payment to his attorney's trust account immediately after receiving Trustee's notice of the termination.   Slominski asserts that the deposit in his attorney's trust account cured any default under the lease and was entirely appropriate given unresolved issues about set-offs and credits due Slominski.

2

Slominski also asserted a counter-claim to the Trustee's adversary complaint.   In

the counter-claim, he asserts a claim for intentional interference with his contract

with KGLP.   After hearing the evidence and arguments, and carefully considering

post-trial briefing, the Court decides the Trustee can set aside the lease as a

fraudulent transfer under both § 548(a)(1)(A) and (B).

## PROCEDURAL BACKGROUND

KGLP's involuntary bankruptcy — in which this adversary case arises — is

one of three cases filed in the Bankruptcy Court for District of North Dakota

involving Thomas and Mari Grabanski.   The other two cases are the voluntary

Chapter 11 filing of Thomas and Mari Grabanski individually (aka Grabanski Grain

LLC, aka G & K Farms Farms, aka MTM Farms (No. 10-30902)) and Grabanski

Grain LLC. (No. 10-30924).   The KGLP involuntary Chapter 11 was subsequently

converted to Chapter 7.   It is most closely aligned with the case of Thomas and Mari

Grabanski individually.   The question of confirmation of the Chapter 11 plan of

reorganization of Thomas and Mari Grabanski is also pending before this Court.

The decision in this case will affect the plan on file.

The involuntary Chapter 11 bankruptcy of KGLP was converted to a Chapter

7 on October 11, 2011.   The factual background, procedural history, and legal

rationale for that conversion are found in the Court's 60-page opinion in that case.

In Re Keeley and Grabanski Land Partnership, 460 B.R. 520 (Bankr. D.N.D. 2011).

3

The extensive factual findings include many matters that provide context and foundation for the decision in this case.   Thus, the Court incorporates by reference all the procedural background and factual findings in that ruling unless otherwise specified.   Some of that material will be repeated below to give a full understanding of the procedural context and specific factual matter currently before this Court.

The specific procedural context of this case is as follows.   By Complaint filed August 26, 2011, Kip M. Kaler, in his capacity as the then Chapter 11 Bankruptcy Trustee of Debtor KGLP, initiated this adversary proceeding.   His Complaint seeks to avoid Defendant Louie Slominski's lease with KGLP as either an unauthorized post-petition transfer under 11 U.S.C.§ 549, or as a fraudulent transfer under 11 U.S.C. § 548, subject only to Slominski's right to harvest the currently existing crops.

Specifically, Trustee alleges the lease was not fully executed until after the filing of the involuntary bankruptcy and thus may be avoided under § 549. Alternatively, if the Court concludes that the lease was executed before the bankruptcy filing, Trustee alleges the lease is avoidable under § 548 because Slominski did not give fair value to KGLP for the lease interest KGLP conveyed to Slominski.   Trustee alleges that the terms of the lease granting Slominski the right to use the property for three years was not a fair, arms-length, transaction, that Slominski is not a good-faith purchaser for value, and instead, is an insider of

4

KGLP.   Trustee also requests termination of the lease and a monetary judgment against Slominski for the fair value of the rent due the bankruptcy estate for the period of time Slominski used the property, plus interest.   Trustee also requested "interim" relief in the form of attachment to all existing crops, in an amount sufficient to compensate the bankruptcy estate for a crop share rental basis (including all government program and insurance payments) of not less than 30%.

Trustee filed a Motion for Default Judgment on September 30, 2011. Slominski filed a Response and Resistance to Motion for Default Judgment and Request for Hearing on October 6, 2011.   On the same day, he also filed an answer and counter-claim.   Slominski denies the allegations in Trustee's Complaint.   In his counter-claim, Slominski alleges Trustee has intentionally interfered with Slominski's lease contract with KGLP and continues to do so.   Slominski alleges Trustee's actions constitute a breach of Slominski's lease with KGLP.   He alleges Trustee's actions adversely affect Slominski's rights under the lease and as a result, Slominski suffered damages.   Slominski also claims significant costs in preparing and improving the land and that he is entitled to reasonable compensation for his labor and improvements under the lease.   Slominski requested costs, disbursements and reasonable attorney's fees.

On November 21, 2011, (after KGLP's Chapter 11 was converted to Chapter 7) Trustee filed a motion for partial summary judgment.   Trustee based his motion

5

for partial summary judgment on a lease termination theory.    Trustee claims

Slominski failed to make timely payment to KGLP on the lease.    On December 2,

2011, Slominski filed a resistance arguing there are genuine issues of material fact to

be resolved at trial.    On December 5, 2011, Trustee filed a reply.    The Court denied

Trustee's motion for partial summary judgment.    The Court concluded Trustee

sought summary judgment on a theory — Breach of Lease — never pled in the

adversary complaint.    The Court concluded that it would consider the merits of

Trustee's request to terminate the lease as a motion to be heard in conjunction with

the trial on the adversary.

The matter was tried in Fargo, North Dakota, January 24-26, 2012.    After

trial and before entry of this Memorandum and Order, Trustee filed a Notice and

Motion for Sale of Real Estate and Personal Property Free and Clear of Liens and

Encumbrances, Motion for Authority to Act as Operating Trustee and/or Sell

Standing Crop, and a Motion Prohibiting Slominski from Trespassing on Estate

Property, in KGLP's main bankruptcy case.    The Court held a telephone hearing on

Trustee's motions on March 2, 2012.    The Court granted Trustee's motion for sale

of real estate and personal property free and clear of liens and encumbrances.    The

Court took Trustee's motions (1) to prohibit Slominski from trespassing and (2) for

authority to act as operating trustee and to sell standing crop under advisement to

decide with the issues tried in January.

6

## FACTUAL BACKGROUND

### A.    Before Slominski Got Involved

Thomas and Mari Grabanski had made their home and farm in Grafton, North Dakota for many years.   Sometime in 2006 or 2007, Tom Grabanski and John Keeley — another farmer from the Grafton, North Dakota area — began discussing and eventually entered into, farm partnerships to do farming in the State of Texas. These two men, with their wives, Mari Grabanski and Dawn Keeley, formed two partnerships specifically geared to farming land in Texas.   They formed "G & K" (Grabanski and Keeley) Farms and KGLP (Debtor here).   G & K Farms was set up to serve as the company to operate the Texas farms.   All equipment, inputs and operational expenses would run through and be a part of G & K Farms.   KGLP was set up to hold whatever land they bought for farming.

KGLP eventually purchased two large parcels of land near or around Blossom, Texas.   The two parcels are referred to throughout the proceedings as the "Lenth Parcel" (also referred to as the "DeKalb Parcel") and the "Unruh Parcel". KGLP purchased the Lenth Parcel from Eldon Lenth.   The Lenth property is located in Bowie County and is also referred to as the "Dekalb" property.   The Lenth property is approximately 2000 acres, including 1700 tillable acres, and six new irrigation pivots.   KGLP purchased the Unruh Parcel from Earl Unruh.   The

Unruh property is located in Lamar County.    Slominski testified the Unruh property

is approximately 200 acres and a third of it is irrigated.

G & K Farms applied for and received most of its initial funding from Choice

Financial of Grafton, North Dakota.    G & K Farms entered into an agreement to

establish a $3,500,000 line of credit with Choice Financial.    That line of credit was

secured by Choice Financial's interest in the equipment purchased by G & K Farms

and by additional individual security interests on equipment owned individually by

the Grabanskis and Keeleys.

John Keeley testified that while Choice Financial (Choice) financed the bulk

of the down payments for the land purchases he also personally contributed

$180,000 that he borrowed from another source toward the down payments.

Keeley testified that Choice's collateral included the Keeleys' personal assets.

Keeley and Grabanski also bought irrigation equipment and placed it on the Lenth

property.    Keeley testified that they bought three large grain bins, scales and a scale

house which were placed on the Unruh property.    Grabanski claims the equipment

was owned by G & K Farms.

John Keeley testified that Choice Financial knew of the use of the G & K

Farms' line of credit money for the land partnership (KGLP) purchases.    G & K

also purchased farm equipment, inputs, and other items necessary for a farming

operation.

8

G & K began farming the KGLP land in late 2007 or early 2008.   By early 2009, the Keeleys decided they wanted out of the partnerships with the Grabanskis. Tom Grabanski was in charge of most of the day-to-day operations for the Texas farming.   Grabanski did not provide sufficient information to the Keeleys and trust began to break down between them.   The Keeleys no longer trusted Tom Grabanski.

This resulted in an agreement in September 2009 where the Keeleys assigned and transferred all their interest in both G & K Farms and KGLP to the Grabanskis. In exchange, the Grabanskis assumed all debts, liabilities, and expenses of the two partnerships — essentially agreeing to pay all debts and creditors of the G & K Farms and KGLP partnerships.   The agreement also specifically provided that the name "G & K" Farms would no longer be used.   The Grabanskis then formed Texas Family Farms as a partnership to take over for G & K Farms.   The agreement was deemed effective April 30, 2009.

The Keeleys ceased their involvement with G & K Farms and KGLP, but, Choice Financial did not release the Keeleys from their individual security obligations.   The partnership transfer agreement provided only that the Grabanskis agreed to take care of the debt related to G & K and KGLP.

The Grabanskis fell behind on many of their G & K and KGLP obligations soon after the Keeleys transferred their partnership interest to the Grabanskis.

9

Through a series of discussions between the Grabanskis and the Keeleys, the Keeleys agreed to put up the money for the full-year payment on the Unruh parcel. This was done despite the agreement by the Grabanskis to take care of all continuing obligations of G & K Farms and KGLP.   The Grabanskis simply did not have the resources to make the payment.   The Keeleys made the payment based in part on assurances from Tom Grabanski that he or the land partnership would pay them back.   The Keeleys also had incentive to make the payment because they were still obligated to Choice Financial for whatever the Grabanskis failed to pay.

Eventually, the Grabanskis' financial problems overwhelmed them.   They lost their North Dakota farming operations.   Grabanski testified he ended up in tough times and was not able to fulfill all of his contracts.   He filed his personal Chapter 11 bankruptcy petition on July 22, 2010.   He testified he could have filed Chapter 7 and sold the land but it would not have generated as much money.   The Grabanskis relocated to Texas and took up residence on the Unruh parcel.   Their intention was to farm the Lenth and Unruh parcels through Texas Family Farms (successor to G & K Farms) and KGLP.

## B.    Slominski Becomes Involved with the Texas Farming Operations

Part of the Grabanski plan to make the Texas farming operation successful was to utilize the services of Louie Slominski.   Slominski was, and is, a close friend of the Grabanskis.   He owns a farm and lives in Minto, North Dakota.   Minto is

10

approximately ten (10) miles from Grafton — where the Grabanskis lived for many

years.   Slominski and Grabanski had known each other for several years through

the community and, in particular, through farming.   They had entered into a farm

partnership together in the Fargo area.   Slominski testified that he became a very

good friend and confidante of Tom Grabanski.

As Grabanski was attempting to get the Texas operation going for the 2010-11

crop year, he needed some assistance from Slominski to do some custom planting.

Sliminski admitted he knew there were legal and financial issues with KGLP but did

not recall if he knew at that time that Grabanski had filed his personal bankruptcy

petition.   Nevertheless, Slominski and a crew of three men with a planter went from

North Dakota to the Texas properties in August 2010.   They prepared to do the

custom planting work.   They planned to return to North Dakota as soon as they

finished.   However, because the Grabanskis had not kept current on G & K

obligations to Choice Financial, Choice Financial pursued collection efforts against

them.   Those collection efforts culminated in Choice Financial seizing virtually all

of the Grabanskis farming equipment on the Texas properties.   This halted the

Grabanskis' harvest.   Choice hauled out what had been harvested and rutted up the

land in doing so.   Choice did not harvest the remaining crop.

Slominski was on-site when Choice seized virtually the entire Grabanski

farming operation.   Slominski testified that, at that point, Tom Grabanski was

11

unable to farm the land.    Slominski said he stepped in to help his friend.

Slominski said he essentially went from a custom-planter to the operator of the farm

almost overnight.

During this same period, it came to light that Grabanski had not kept up

payments to the Lenths on their parcel of land.    Grabanski received a Notice of

Acceleration and Demand dated October 11, 2010, relating to the Lenths' property.

Keeley testified he was shocked when he became aware of the notice on October 13,

2010.    He began calling the Bowie County Courthouse every couple of days for

further information.    After three weeks of calling, Keeley was informed of the

Notice of Foreclosure.    Keeley testified he was concerned about the possible

foreclosure because he had pledged all his personal assets to Choice.    Without the

Lenth property to generate income, creditors would not get paid, and they would

come after him.

Slominski called Keeley, stated that he was in contact with Grabanski, and

inquired if there was a solution to the pending foreclosure.    Slominski contacted

Grabanski and then came back to Keeley with farfetched ideas that did not pay off

Choice.    The Acceleration and Notice of Foreclosure included the Court paperwork

setting out the foreclosure sale for December 7, 2010.

Grabanski testified at trial about how he thinks this "sudden" problem with

the Lenth property might have come about.    His thought was he made a partial

12

payment of $95,000 on the Lenth promissory note when the full payment was due in January 2010.   He believes his dad, Merlyn Grabanski, made the $370,000 payment on the Unruh promissory note.   Grabanski did not recall if he received the Default Notice and Demand for Payment dated July 12, 2010.   He said it is "possible" his bookkeeper received it.

Before the foreclosure paperwork made it to him (for the first time in October, 2010), Keeley and Grabanski had agreed to try and sell the Texas properties. Through contacts made primarily by Keeley, they ended up with a broker named Kalin Flourney.   Flourney specialized in the sale of larger ranches and larger farms in Oklahoma, Texas, and the surrounding region.   They eventually listed the properties for sale with Flourney.   However, as time went on, the communication between John Keeley and Tom Grabanski completely fell apart.   Flourney testified that he primarily discussed the listing and sale with Tom Grabanski at the relevant times.

Flourney was caught completely off-guard when Keeley notified him in October of 2010 that the Lenth parcel (for which Flourney had a listing agreement) was set for foreclosure sale in December 2010.   Flourney testified that he would have expected Grabanski to have informed him of that back in July when he first got the notice.   Flourney pointed out that he was notified of the foreclosure sale far too late to effectively do anything to sell the property.   He also testified that he could

13

have helped to complete the sale — as he had a very interested buyer — if he had been notified in July of the problems with the property and the potential foreclosure. He specifically stated that he had a buyer that likely would have been able to partner with an investor to get the sale made, had Grabanski notified him in time.

Once they received notice, the Keeleys immediately began to scramble to figure out how to deal with the pending foreclosure. They consulted their attorneys and began to take action. Keeley and Flourney both testified that Grabanski appeared to be doing nothing to attempt to prevent the foreclosure. Grabanski did not take action to prevent the foreclosure because there was no benefit to him. In spite of the fact that there was substantial equity in the property, Grabanski concluded that it would only benefit the Keeleys to sell the property. The equity would all go to Choice Financial and would simply reduce the Keeleys' obligation to Choice Financial. Because Grabanski did nothing and provided no help to prevent the foreclosure sale, the Keeleys were forced to file the involuntary bankruptcy of KGLP (property owner) to stop the foreclosure sale. They filed the involuntary bankruptcy on December 6, 2010 — one day before the foreclosure sale was scheduled.

During the run-up to the foreclosure sale and eventual involuntary filing, several things had happened with Slominski and Grabanski on the Texas farming operation. Milo had previously been planted on the Lenth property. Slominski

14

said it would take four days to harvest.   Soybeans and alfalfa had previously been

planted on the Unruh farm.   The alfalfa was ready to harvest and the soybeans were

also ready to harvest in late fall in three fields.   Without any equipment to harvest

and three employees sitting without work, Slominski said he needed to help figure

out a plan.   Grabanski had become virtually paralyzed by his financial and

emotional problems.   Slominski had gotten himself deeply involved trying to help

his friend out.   Slominski claims — without any corroborating evidence — that he

had already spent $125,000.00 on a planter to custom plant once the harvest was

complete.   Slominski spent a week in November 2010 in Texas to complete the

necessary work.   He thought he could help Grabanski make it work.

In November 2010, Slominski purchased seed and opened a checking account

in his name in order to help Grabanski farm in Texas.   Slominski eventually gave

Grabanskis the authority to write checks on the accounts.

## C.    The Lease

As the foreclosure sale loomed, Slominski and Grabanski claim they decided

to enter the lease at issue in that case.   Slominski testified he received the lease in

the mail from Grabanski on December 1, 2010.   He did not recall if Grabanski's

signature — on behalf of KGLP — was on it.   Slominski signed the lease.

Grabanski testified he also signed the lease.   He claims he did so before the

15

involuntary bankruptcy petition was filed, but could not provide a date or documentation to back-up that assertion.

The lease between KGLP and Slominski is for a three year period. It began December 1, 2010, and expires on November 1, 2013. Slominski, as the tenant, pays KGLP, the landlord, the sum of 20% of the gross proceeds derived from the land, with an annual minimum payment of $300,000.00. The lease premiums are due November 1, 2011, November 1, 2012, and November 1, 2013. The lease allows Slominski to be reimbursed or credited for any maintenance or repair on the irrigation system. If either party fails to carry out any material provisions of the lease, the other party has the right to terminate the lease. Termination becomes effective 15 days after notice unless the delinquency is corrected during the fifteen-day period. Grabanski testified that he acted in good faith in executing the lease. He thinks it is a "fair" lease.

Slominski did not look into whether lease payments would cover KGLP's mortgage payments. He said that even if the lease payment is insufficient to cover Debtor's mortgage payments, the lease payment with crop share is better than leaving the land to the weeds.

Slominski signed the lease based upon the condition of the land at the time. He factored in the amount of money that would need to make improvements to the

16

land.   He provided no back-up dollar amount or document showing what he factored in, how he did it, or how much cost might be involved for repairing the land.

Slominski believes other expenses he incurred should be reflected in the lease price settled on.   Slominski testified that it cost him $5,000-6,000 to move each piece of equipment to Texas.   He made approximately five trips.   Slominski claimed he spent a lot of money ditching the land and that he wrecked equipment in doing so.   He provided no numbers or back-up documentation for these assertions. Grabanski testified at trial that Slominski "ditched" for three weeks to repair the damage Choice caused to the land.   Grabanski — again without any documentation — asserts Slominski invested $50,000-60,000 to "ditch" the property.   Slominski said he needed a three-year lease to recoup the unquantified investment he made.

Grabanski testified that the three grain bins on the land, the irrigation pivots, the scale, and scale house and shops are owned by G & K Farms (which was supposed to have ceased operations).   Grabanski again claims, without any numbers or back-up support, rent for these items was figured into the crop share lease.   Slominski admitted he knew others were owed money for the irrigation equipment and he did not know whether it would be repossessed.   He then asserted his belief he has the right to its use under the lease agreement.

After signing the lease, Slominski hired Grabanski as his farm manager.   He said the farm manager's role is to find land, decide what and when to plant, and

17

oversee the general operation of the farm.    Slominski testified that when you are a

tenant living in another state, there is no other way to farm without a farm manager.

Slominski testified his relationship with Grabanski was based on trust and that their

farming ideas and concepts are similar.

Slominski allows Grabanski to live rent free in a nice, 3,500 square foot house

on the Unruh property.    He pays all living and housing expenses for Grabanski, his

wife, and four children.    Slominski claims he and Grabanksi originally agreed on a

monthly compensation for Grabanski.    However, Slominski could not recall the

amount.    He does not know what Tom or Mari Grabanski have been paid.

Slominski admits health insurance premiums and numerous other costs for the

Grabanskis were paid out of the checking account.

Grabanski testified that during December 2010, he also had discussions with

Earl Unruh numerous times.    These discussions centered on the possibility of

Unruh foreclosing and then Grabanski renting the property back after the

foreclosure. Grabanski testified that Paul Doherty sent a lease to him so he could see

if Slominski wanted to sign.

At the time of the involuntary bankruptcy filing, the Keeleys were entirely

kept in the dark on the status of the Texas farming operations — which were critical

to repay Choice as Grabanski had agreed.    They knew Grabanski did nothing to

stop the foreclosure.    They knew nothing about the lease with Slominski.    Keeley

18

learned that Grabanski had been working his own side deal with Lenth to lease the property back after foreclosure. Grabanski, in fact, testified that Lenth was upset with Keeley for filing the involuntary bankruptcy petition because Grabanski was going to lease the property back from Lenth once foreclosure went through. Keeley testified he received a phone call from Lenth after he filed the involuntary petition and Lenth threatened to sue him.

Keeley spoke with Slominski for the first time on December 17 or 18, 2010, after receiving yet another phone call from the Unruhs inquiring what was going on at the property. Earl Unruh had seen a tractor with Slominski's name on it on the property. Unruh wanted to know who was farming the property and how he could get paid. When Keeley spoke to Slominski, Slominski never mentioned the lease with KGLP. Keeley said the conversation was brief but he did specifically tell Slominski not to plant because it was a bad situation. Keeley testified he had no conversation with Slominski after that for a very long time.

While Slominski remained involved in the operation in Texas, much of it continued to operate exactly how it had under Grabanskis' previous ownership and direction. The insurance on the crops on the Lenth and Unruh properties was taken out in Merlyn Grabanski's name. Only a transfer of indemnity was completed when Slominski became involved.

Slominski took advice from Grabanski.   He says he could not find a better

farm manager than Grabanski.   He claims Grabanski's past mistakes are being used

to full advantage to move them in the right direction.

While Slominski is certainly the one legally responsible and is the only one of

them who has real money to lose, Grabanski had, and has, the authority to make

virtually all farm decisions.   He is allowed to write checks on the checking account

without any need to account for expenses.   He remains in possession and

day-to-day control of the land.   Slominski has a great commitment to and affection

for Grabanski.   Slominski, in fact, testified that if Grabanski could get his legal

battles handled, he would like to do more work with him or even partner with him.

Slominski testified that Grabanksi wants to make this land farm project work.

Slominski wants to help him make it work and to take care of the Grabanskis in the

process.

Slominski attempted to show some hands-on involvement with the Texas

operation.   After signing the lease, Slominski traveled to Texas periodically.   He

went down in March or April 2011.   While he was there, a windstorm brought down

two pivots on the Unruh property and two towers tipped over that needed repair.   A

service technician estimated the cost of the repair would be between $30,000 and

$40,000.   Slominski repaired the equipment "himself" over a six-day period.   He

claims he expended an unquantified money and labor to repair the irrigation

20

equipment that has not been reimbursed.   He provided no documentation or other amounts expended for parts and labor — his or others.

Slominski first communicated with Trustee in May or June 2011.   They spoke regarding rental contracts and his willingness to renegotiate the lease.    He recalled Trustee telling him, "If I were you, I wouldn't continue to farm." Slominski claims to have had $25,000 invested in the property at that time.

Slominski does have equipment in Texas.   He testified that he has a planter, combine, row crop planter, two discs, four semitrailers, one new tractor, four smaller tractors, sprayers, another tractor, and maybe other equipment there.   He has not taken over assets of KGLP's but "may have" made payments on the equipment in order to keep using it.   He does not know who owns the equipment.   He just makes payments so Grabanski can keep using it on the Texas farming operation. Slominski also testified since he was using some of the farm vehicles, he paid the insurance on them.

Slominski keeps a simple spreadsheet of all the harvest.   It consists of the number of bushels that came off each field, scale tickets, and invoices from the elevator.   Every single load was documented by Mari or Tom Grabanski.   They provided Slominski with virtually all the information he has.   If a payment comes out of the Texas account, it is Tom or Mari making the payment out of his Texas account on his behalf.

Slominski acknowledged he had not supplied Trustee with all the documentation Trustee requested over time and particularly in this litigation.   He provided what he had, and his accountant was still preparing documentation during the trial.   Slominski said he was just trying to keep it all afloat.   He was trying to run his farm in North Dakota, get the documentation produced as ordered by the Court, and parent his children on his own while his wife has been gone a few months.   He was also trying to keep a roof over Grabanskis' heads, keep them fed, and keep them farming.   He knows very little regarding the details and day-to-day operations of the farm in Texas.   He leaves that almost entirely to the Grabanskis.

**Lease Payment**

Slominski did not timely pay the rent November 1, 2011.   Instead, he placed a check for the lease payment in an escrow account pending the outcome of this litigation.   He only did so after Trustee notified him he was in default and Trustee intended on terminating the lease.   Trustee provided that notice in a letter dated November 3, 2010.   A check was issued from Slominski's account on November 10, 2010 for the sum of $314,464.55.   It was made payable to Johnston Law Office-Trust Account.   The memo line on the check indicates, "Land Rent Texas Property 2011."   Slominski testified Trustee would have received the payment directly had the allegations in this case ceased.   That continued to be his stance

22

today.    Slominski testified he has performed under the lease, that he has invested in

the leased property, and that the money in escrow is all he has protecting him.

**Real Estate Broker**

Kalen Flournoy testified he is a farmer and real estate broker from Roseville,

Oklahoma.    He has been licensed in Oklahoma since the fall of 2006, and he was

licensed in Texas a year or two later.    He sells mainly farms and ranches.    Flournoy

testified that a Kansas broker informed him that Keeley was looking to liquidate

some land. In late April 2009, Keeley and Grabanski were both contacts for listing

the property. By late fall of 2009, his contact changed to primarily Grabanski, and

Flournoy took instruction from him.

Flournoy testified he had a short listing of each property in April 2009.    The

Lenth property was listed for $4,800,000 and the Unruh property was listed for

$6,400,000.    There was an offer on the Lenth property for $3,500,000 in late

summer 2009.    Shortly before this offer, the listing price on the property had been

reduced to $4,300,000.    Grabanski turned down the offer.    A week later, Grabanski

called Flournoy back and inquired whether Flournoy thought the buyer would

reconsider putting his offer back on the table.    The listing expired late July or

August 2009 on one property and the other expired in 2010.    Flournoy asked

Grabanski if Keeley had transferred ownership deeds to him and Grabanski said no.

Flournoy testified all adjustments on the listing price were always in reducing the

price.   Keeley informed Flournoy in October or November 2010 that Elden Lenth was foreclosing on the Lenth property.   Flournoy called the clerk of court and nothing had been filed.   He later saw a poster in the basement of the courthouse with the auction scheduled the following week and realized he had been calling the wrong court.   Grabanski called Flournoy after Keeley filed the involuntary bankruptcy petition and said, "Your buddy Keeley blew it this time."   Flournoy suggested to Grabanski that it was good news because it stopped the foreclosure, but that was the end of the conversation.   The listing price was lowered to $3,500,000 and the property was shown to Darryl Strander.   Soil samples were taken of the land in mid-January, and Strander had the results and everything checked out.   At that point, Flournoy informed Grabanski of the offer and Grabanski asked the listing price.   When Flournoy informed Grabanski the listing price was $3,500,000, Grabanski told Flournoy he would not let it go for that.   Grabanski informed Flournoy there was a lease on the property for two years.   Flournoy asked if the lease payment covered the mortgage obligations, and Grabanski said it did not. Flournoy testified he removed the listing immediately following that conversation because the property was leased and Grabanski said he was done trying to sell it.

Grabanski later asked Flournoy twice to raise the listing price on the Unruh property to $6,900,000 with a two-year lease back to Grabanski.   Flournoy testified he did not raise the listing price.   Grabanski then called and asked Flournoy if the

24

listing price had been raised and Flournoy informed Grabanski he did not raise the listing price because he did not think it was reasonable.

At one point there was a purchase offer on the properties in the amount of $8,500,000. For reasons that are not clear, the purchase offer on the properties was reduced to $8,000,000. He sent the original offer he drafted on behalf of the buyers to Grabanski. Grabanski changed a lot of the terms when he counter-offered, such as a sooner closing date, higher purchase price, earnest money, lease back option, lease back price and due diligence time frame. Flournoy said he was working with U.S. Realty Purchasing Agent Kevin McTatterson. U.S. Realty made an offer on the Lenth property in the sum of $3,500,000 and an offer on the Unruh property in the sum of $4,500,000 on March 8, 2011. Grabanski did not respond to the offers. Flournoy testified a two-year lease back affects the saleability of the farms. Flournoy testified there needs to be specific returns to make a lease work on a farm. In the past couple of years, it has been investment groups interested in purchasing farm land, and investment groups do not want crop share leases, only cash rent leases, if any. Flournoy testified that a crop share lease is not a conveyable lease as it is relatively easy to cheat a landlord and farmers therefore do not want a crop share lease. Flournoy testified it needs to be a cash lease so it can easily be calculated if there is a return. Whoever buys property wants to either occupy it immediately or they want to close before the summer planting season. Flournoy testified that he

25

has four to five good prospective buyers for the properties but none of them are interested in buying with an existing lease.

Flournoy testified that a sale has to be viable and he does not bring unviable offers.   Flournoy testified under the existing lease he feels it is a risky proposition for all those involved.   As a real estate broker, he does sometimes build lease packages into certain sales and they provide a tenant.   When he has a purchase offer that contains a lease component, he does not guarantee the lease, and he does not provide a tenant for a lease option.   Flournoy also did not think an increased listing price of $6,900,000 for the Uhruh property would bring a buyer.

Flournoy testified that had he known a month earlier about the foreclosure, he would have been able to sell the property for more than it would have garnered through a foreclosure.   Flournoy testified that he did not believe the two properties would sell together at this point in time.   He testified the water ran out on the Lenth farm in July and the ponds and lakes are pretty dry.   Flournoy also testified that a closing date can be negotiated when the seller is the tenant.   In this case, the seller is not the tenant and the tenant has planted a crop.   Flournoy testified there are offers waiting, but they need closing dates which Trustee has not provided.   There are willing buyers but not if the sale includes a lease.   Three out of four buyers are farmers who do not want a lease at all because they want to move onto the farm and farm it themselves.

26

**Expert Witness on Valuation of Property and Lease**

William Pat Murphy lives in Blossom, Texas.   He owns an appraisal and management firm.   He received his Bachelor of Science in Agricultural Economics from Texas A&M in 1969, and has been an independent fee appraiser since 1977. Murphy has completed fair market appraisals since 1978 and appraises 50-80 properties a year.   He is also a broker but does not sell often.   Murphy owns a 1,000-acre farm and is a manager for 6,000 acres for absent owners in adjacent counties.   Murphy has testified in court as an expert twice in the last four years, and has testified 300-400 times total.

Each appraisal he completes contains a work file.   Murphy documents relevant information in the appraisal but some conversations might not be documented.   In his work file, he also documents the correspondence with various individuals if they pertain to information he did not know previously.

Murphy was hired by Trustee to appraise the Lenth and Unruh properties. The purpose of the appraisal was to estimate the market rent of the farms and to analyze the lease at issue as of December 1, 2010.   Murphy relied on his personal knowledge and surveys of area farmers with experience and similar-sized tracts. Murphy's appraisal contains an overview of the rental market with comparable property and buildings.   He compiled the value of the improvements on the

27

properties, found rentals and dwellings comparable to the properties at issue, and made an estimate as to the rental value of the property.

**Property at Issue**

Murphy's appraisal consists of identification and summarization of the properties at issue, including legal descriptions.   Murphy testified that 87% of the land is tillable, 48% of it is irrigated and it is 105% "base acres" due to the ability to double crop 2000 acres.   The ability to build up base acres based on production is important as it allows you to qualify for federal programs with the USDA.

Murphy testified the Uhruh property includes an upscale, modern 3,657 square foot house built in 2002, a large 700-foot garage, and 8000 feet of concrete. Murphy's appraisal also included two framed, worker-quality homes.   There is a mobile home on one of the leased properties, two outbuildings, a 7,000 square foot shop, and a 400,000 bushel grain storage barn, built in 2007.   The property also has three grain bins and truck scales built in 2008, and corrals.

The lease includes 3881.7 acres of land, of which 3371 acres are tillable.   The irrigation equipment and grain bins were added to the property after KGLP purchased the properties.   Murphy testified that he had previously appraised the Unruh property at least two times.   He lives less than a mile from that property. Murphy testified that it is a well-maintained farm.

28

Murphy testified these properties are likely to attract a large-scale farmer who wants to expand. The 3,800 acres is attractive because it is a lot of land for the area and larger farming operations minimize costs by having resources all on one farm. Larger farms bring in a higher rental rate than smaller ones.

Assumptions and limiting conditions are required in an appraisal. It is an extraordinary assumption that water supply is adequate. Pivots provide adequate water for typical crop. Corn is the highest yielding crop, but it also demands the most water. Texas is in a drought and irrigation sources are drying up. Irrigation on the Unruh property relies on surface reservoirs. The Lenth property relies on wells. The salinity of river water brings down the productivity of the crop. Farmers therefore generally prefer well water.

Irrigation fueled by diesel is the most expensive to run. Generally, the landowner pays for irrigation. In some instances, the tenant pays the first $1,000-1,500 and the landowner pays the rest. If pivots only provide water for part of a crop season, then they have some value but not as much as if they supplied water all season. If actual water amounts were available on the land to irrigate it all season, it would change his appraisal.

Murphy did not go onto the property at issue or into the houses when he completed his appraisal. Murphy did not go into the comparable homes. He was familiar with all of the properties and the area.

29

Murphy testified that wheat is currently growing under the irrigation pivot, but that another crop would normally be planted under an irrigation pivot.   As such, Murphy testified the farms are not being farmed to their maximum potential.

Murphy does not take into account the debt against the property in an appraisal.   He appraised the value of the property on the open market on a cash basis.   Market rents are not affected by the personal financial situation of those involved.   Weather also does not have a material effect on market rents.   The climate in 2010 was a wet spring, extremely dry summer, a wet fall and a dry winter. Murphy looks forward when determining the value of a lease and the outlook for 2011 was good when the 2010 lease was executed.   Farmers usually expect the next year to be normal and are constantly faced with decisions affected by the weather and when crops can be planted and harvested.   Murphy testified rutted land is fairly common in the area when there is impacted drainage.   A farmer may have to chisel the whole land to correct impacted drainage.   The fact that Slominski thought the land could not be farmed as it was — until fixed — is immaterial to cost assumptions because it is a personal opinion.

Murphy considered 16 leases on comparable properties that provided a good overview of the general market.   The irrigated market ran from $100 to $220 per acre in base rents and from 25% to 33.33% in share rents with no expense to the landlord except for irrigation equipment repair beyond the first $1,500 per pivot.

30

The dry land lease rates ranged from $25 per acre for older "black land" (lower quality) to $40 per acre, to $65 per acre for more current leases.    The dry land leases on river bottom land ranged from $50 per acre to the current $125 per acre.    River bottom land is more valuable than black land.    Murphy testified that for small farms, leases are probably 50% crop share leases and 50% cash leases.    Larger farms are mostly cash leases.

His review of comparable property consisted of a property descriptions of the comparable property, aerial maps, FSA maps he received from Trustee, 156 Forms, legal descriptions, and location maps.    The 156 Forms came from FSA farms. Only two 2010 leases were listed in his report and some of the previous year leases may have been multi-year leases.    His work file is approximately 72 pages and his report is his professional opinion.

The comparable homes he used are right outside of town.    There were none located on farms.    Rural rentals go quickly because most are owner operated.    Rent is determined per square foot.    In his estimations, if he made any adjustment in his appraisal, it was downward and conservative.    Nice rural land and good housing were in high demand and added value.

Slominski provided examples of additional comparable leases right before trial.    They did not make Murphy rethink his opinion.    In his opinion, the leases

were not good comparables. Murphy remained very pleased with his own comparables.

Murphy concluded the 2010 lease at issue here is substantially below market value. The lease is, in fact, almost the same as Grabanski had tried to negotiate with Unruh for 1750 acres. That had only one shop and no improvements. The property leased under the 2010 lease here now has improvements, grain storage and houses. Murphy believes the fair market value of a cash rent lease on the property is $490,845. Murphy testified if the lease were a crop share lease, 25% is fair market value without any variable expenses plus $105,000 cash in advance. Rental for the house and grain bins would be in addition to the 25%. Share rents (like the one here) should also be higher than cash rents because the landlord is taking on more risk. The 2010 share rent was too low. Murphy also testified that crop share leases are not common on large farms. He concluded, based on all his experience and familiarity the area, the 2010 lease was far below market.

Slominski attempted to impeach Murphy's testimony. He attacked mainly his assumptions and the comparable properties he used. Slominski did not provide his own expert.

The Court stated at the close of evidence that it found Murphy's testimony to be credible. The Court continues in that view even after reviewing the post-trial

briefing and the record.   The Court finds that the testimony of Mr. Flournoy — the

broker — further supports and strengthens Murphy's conclusions.

## CONCLUSIONS OF LAW

**A.    Avoiding Post-Petition Transfer Under 11 U.S.C. § 549**

Trustee alleges the lease between Slominski and KGLP was not executed

until after the filing of the involuntary bankruptcy petition.   Trustee seeks to avoid

the lease as an unauthorized postpetition transfer of property of the estate under 11

U.S.C. § 549.

Section 549 provides, in part:

(a)    Except as provided in subsection (b) or (c) of this section, the
trustee may avoid a transfer of property of the estate--
   (1)    that occurs **after the commencement of the case**; and
      (A)    that is authorized only under section 303(f) or
      542(c) of this title; or
      (B)    that is not authorized under this title or by the court.

11 U.S.C. § 549 (emphasis added).

Four elements must be satisfied to avoid a post-petition transfer under section

549(a): (1) property of the estate; (2) was transferred; (3) post-petition; and (4) the

transfer was not authorized by the Bankruptcy Code or the Court.   <u>Gibson v. United</u>

<u>States</u> (<u>In re Russell</u>), 927 F.2d 413, 417-18 (8th Cir. 1991).

There is no dispute that the lease involves property of the estate that was

transferred without any approval from the Court.   The only dispute is about the

third element — whether the property was transferred post-petition.   Grabanski and

Slominski state that the lease was created pre-petition.   The Court believes the record supports that conclusion.

Trustee argued the signature on the lease was not Slominski's.   Slominski signed a document on the witness stand to substantiate his assertion that the signature on the lease was his.   The signature on the lease and the signature Slominski provided in Court were substantially the same.   Therefore, the Court finds Slominski's assertion that the signature on the lease to be his own is credible.

Weighing all the evidence, the Court finds the preponderance of the evidence demonstrates the lease was created and executed prepetition. Therefore, the transfer cannot be avoided by Trustee pursuant to § 549.

## B.    Avoiding Pre-Petition Lease Under 11 U.S.C. § 548

Trustee next argues that even if the lease was executed prepetition, it can be avoided under § 548, which provides:

> § 548 Fraudulent transfers and obligations.
> (a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

34

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.

11 U.S.C. § 548.

Trustee argues the lease was made with the intent of defrauding creditors, thereby making it a transfer avoidable by Trustee under 11 U.S.C. § 548(a)(1)(A). Trustee further alleges that the lease (transfer) is avoidable under § 548(a)(1)(B) because Debtor transferred its interest in the property within one year prior to filing for bankruptcy, receiving less than reasonably equivalent value in exchange and was insolvent when the transfer was made or became insolvent as a result of the transfer.

## 1.  <u>Section 548(a)(1)(A)</u>

Section 548(a)(1)(A) deals with intentionally fraudulent transfers.   Courts recognize that direct evidence of fraud by the debtor is difficult to produce, so the trustee may put on evidence of "badges of fraud."   <u>In re Matter of Timothy Dennis (Thomas D. Stalnaker, Trustee v. Kathy Dennis)</u>, No. 10-83290, 2012 WL 359872 (Bankr. D. Neb. Feb. 2, 2012) *2–3 (quoting <u>Kelly v. Armstrong</u>, 206 F.3d 794, 798 (8th Cir.2000)).

Those badges include but are not limited to: (1) actual or threatened litigation against the debtor; (2) a transfer of all or substantially all of the debtor's property; (3) insolvency on the part of the debtor; (4) **a special relationship between the debtor and the transferee**; and (5) retention of the property by the debtor after the transfer.

35

Id. (quoting Kelly v. Armstrong, 206 F.3d at 798 (emphasis added)).

Another bankruptcy court in the Eighth Circuit has stated the test in a similar fashion. "Direct evidence of such intent is rarely forthcoming, so the trial court may make an inference on the issue 'from the circumstances surrounding the transfer'." In re Lacina, 451 B.R. 485, 488-89 (Bankr. D. Minn. 2011) (citing In re Northgate Computer Systems, Inc., 240 B.R. 328, 360 (Bankr. D. Minn. 1999), (citing In re Sherman, 67 F.3d 1348, 1353 (8th Cir.1995)). "The courts recognize that certain sorts of events, conditions, or characteristics frequently accompany the execution of a scheme to defraud third-party creditors." Id. (quoting Northgate, 240 B.R. at 360). "The presence of several or more of these 'badges of fraud' gives rise to a presumption of fraudulent intent." Id. (quoting Northgate, 240 B.R. at 360, citing Kelly v. Armstrong, 141 F.3d 799, 802 (8th Cir.1998); In re Bateman, 646 F.2d 1220, 1223 (8th Cir.1981); In re Sherman, 67 F.3d at 1353–1354 (presence of several badges of fraud "can constitute conclusive evidence" of the proscribed intent)).

"If the trustee makes out the basis for such a presumption, the burden shifts to the transferee—which must prove 'some legitimate supervening purpose for the transfers at issue.'" Id. (quoting Northgate, 240 B.R. at 360, citing Kelly v. Armstrong, 141 F.3d at 802). "This a heavy burden: The burden which shifts . . . is not a burden of going forward with the evidence requiring the [debtor] to explain

36

away nature inferences, but a burden of proving that he has not committed the objectionable acts with which he has been charged." Id. (citations omitted).

a.    Badges of Fraud

The Court finds there is no direct evidence of fraudulent intent.    It must then look to the badges of fraud.    All of the badges of fraud are present here.    The foreclosure and involuntary petition in early December 2010, are "actual or threatened litigation against the debtor."    Kelly, 206 F.3d at 748.    The lease transferred "all or substantially all" of KGLP's property.    Id.    Grabanski's "insolvency" — and that of KGLP — are not disputed.    Grabanski/KGLP "retained the property . . . after the transfer."    See id.

The only "badge of fraud" contested is number 4 — the "special relationship" — also described as "insider" relationship in some cases.    A "special relationship" includes one based on family relationship, friendship, or a close association.    In re May, 12 B.R. 618, 627 (N.D. Fla. 1980)).    The Court believes the evidence establishes a "special relationship" between Slominski and KGLP — through Grabanski.    They were close friends and confidants.    Slominski went to extraordinary lengths to help Grabanski and KGLP.

Even if the Court analyze this under the definition of insider, the result is the same.

The Code lists six statutory insiders of corporations, which include a "director of the debtor; officer of the

37

debtor; person in control of the debtor; partnership*833 in which the debtor is a general partner; general partner of the debtor; or relative of a general partner, director, officer, or person in control of the debtor." 11 U.S.C. § 101(31)(B) (numbering omitted). In addition to that list, "courts have identified a category of creditors, sometimes called 'non-statutory insiders,' who fall within the definition but outside of any of the enumerated categories." Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns), 554 F.3d 382, 395 (3d Cir.2009); accord Hirsch v. Tarricone (In re A. Tarricone, Inc.), 286 B.R. 256, 262 (Bankr.S.D.N.Y.2002) (collecting cases). Under the non-statutory analysis, insider status may be based on a professional or business relationship with the debtor that "compels the conclusion that the individual or entity has a relationship with the debtor, **close enough to gain an advantage attributable simply to affinity rather than to the course of business dealings** between the parties." Friedman v. Sheila Plotsky Brokers, Inc. (In re Friedman), 126 B.R. 63, 70 (9th Cir. BAP 1991); accord DeRosa v. Buildex Inc. (In re F & S Cent. Mfg. Corp.), 53 B.R. 842, 848 (Bankr.E.D.N.Y.1985). Courts apply two factors in determining whether a person is a non-statutory insider: (1) the **closeness of the relationship** between the debtor and the transferee, and (2) **whether the transactions** between the transferee and the debtor were conducted at **arm's length**. In re Tarricone, 286 B.R. at 262. "The analysis is a fact intensive one and must be done on a case-by-case basis." Id. (citations omitted).

In re Bruno Machinery Corp. (Bruno Mach. Corp. v. Troy Die Cutting Co., LLC, 435 B.R. 819, 832–33 (Bankr. N.D.N.Y. 2010) (emphasis added).

The Court concludes that Slominski was also a non-statutory insider. He gained his lease through a close affinity with Grabanski, not an arms-length transaction. Thus, all five of the badges of fraud are satisfied here.

b.    Legitimate Supervising Purpose of Transfer

After the Trustee establishes the badges of fraud — which he did — the

burden shifts to the debtor to show "some legitimate supervening purpose of the

transfer."   In re Lacina, 451 B.R. at 484.   Slominski has "the heavy burden" of

proving that he and Debtor did "not [commit] the objectionable acts" that appear to

have occurred.   Id.   Slominski has not satisfied that heavy burden.

As noted at the close of trial, the Court believes Slominski intended to help

Grabanski in any way he could.   He was a very good friend to the Grabanski family.

Unfortunately, his acts that helped the Grabanskis — at a minimum — also

"hindered" or "delayed" KDLP's creditors.   Slominski's kind act toward friends

simply does not change this into a legitimate supervening purpose.

**2.    Section 548(a)(1)(B)**

While the Trustee's proof under § 548(a)(1)(A) is dispositive, the Trustee has

also satisfied § 548(a)(1)(B).   Section 548(a)(1)(B) is commonly referred to as the

Bankruptcy Code's constructive fraud provision.

> In order to prevail under § 548(a)(1)(B) of the Bankruptcy
> Code, the Trustee must prove, by a preponderance of the
> evidence, the following elements:
>
> (1) an interest of the debtor in property; (2) was
> voluntarily or involuntarily transferred; (3) within [two
> years] of filing bankruptcy; (4) where the debtor received
> less than reasonably equivalent value; and (5) debtor was
> insolvent at the time of the transfer or became insolvent as
> a result thereof.

39

In re Lumbar (Patty J. Sullivan, Trustee v. Welsh Living Trust, et al), 457 B.R. 748,

753 (8th Cir. B.A.P. 2011)   Id. (citing Schnittjer v. Houston (In re Houston), 385

B.R. 268, 272 (Bankr. N.D. Iowa 2008)).

Of particular relevance here, the Trustee bears the burden of proving, by a

preponderance of the evidence, that the exchange was not for reasonably equivalent

value.   "A transfer is in exchange for value if one is the quid pro quo of the other."

In re Kendall (Kip Kaler, Trustee v. Able Debt Settlement, Inc.), 440 B.R. 426, 532–

33 (8th Cir. B.A.P. 2010).

> The concept of reasonably equivalent value is a means of
> determining if the debtor received a fair exchange in the
> market place for the goods transferred.   Considering all
> the factors bearing on the sale, did the debtor receive fair
> market value for the property.   It is a "question of fact
> requiring the court to consider all factors bearing [on]
> value in the marketplace."   "[O]ften there is nothing to
> consider beyond simply comparing the fair market value
> of what the debtor transferred against the fair market value
> of what the debtor received. If the two values are
> reasonably similar, no fraudulent transfer has taken
> place."   Other factors courts consider include the good
> faith of the parties and whether the transaction was an
> arm's length transaction between a willing buyer and a
> willing seller.   The inquiry is "fundamentally one of
> common sense, measured against market reality."

Id. (quoting In re Southern Health Care of Arkansas, Inc., 309 B.R. 314, 319 (B.A.P.

8th Cir. 2004; In re Pummill v. Greensfelder, Hemker & Gale (In re Richards &

Conover Steel Co.), 267 B.R. 602, 612 (B.A.P. 8th Cir. 2001); Kaler v. Red River

Commodities, Inc. (In re Sun Valley Prods., Inc.), 328 B.R. 147, 156 (Bankr. D.N.D.

2005); Leonard v. Mylex Corp. (In re Northgate Computer Sys., Inc.), 240 B.R. 328,

365 (Bankr. D. Minn. 1999).

Murphy's thorough appraisal established this lease was for less than

reasonably equivalent value.   He reviewed the properties at issue in depth and the

history of the land.   His appraisal and testimony were credible and are accepted by

the Court.   The Murphy report and conclusions establish the fair market value cash

rent of the properties is $495,845 or crop share rent of $105,000 and 25% crop share

plus additional rent for the house and grain bins.   The lease here is for far less.

Therefore, 548(a)(1)(B)(i) has been met.

To succeed on his claim, Trustee also must meet one of the four (B)(ii)

elements.   None of the elements of § 548(a)(1)(B)(ii), however, are, or really ever

have been, in dispute.   KGLP and the Grabanskis were insolvent at the time.   The

involuntary filing makes that clear.   The Trustee has established the right to avoid

the lease under both sections, 548(a)(1)(A) and 548(a)(1)(B).

## C.    Breach of Lease

Trustee also argues that even if the lease is a valid prepetition lease, that

Slominski breached the lease by not making a lease payment to Trustee by

November 1, 2011.

The essential elements of breach of contract claim under Texas Law are: "(1) the existence of a valid contact; (2) performance or tendered performance by the plaintiff; (3) breach of contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." Mullins v. TestAmerica, Inc., 564 F.3d 386, 418 (5th Cir. 2009) (citing Aguiar v. Segal, 167 S.W.3d 443, 450 (Tex. App. –Houston [14th Dist.] 2005).

Under the terms of the lease, Slominski has 15 days from the time of the notice to cure the delinquency or the lease is deemed terminated. Trustee notified Slominski he was terminating the lease in a letter dated November 3, 2010. Slominski admits he did not make a lease payment directly to Trustee. However, Slominski escrowed the lease payment in a trust account with his attorney pending the outcome of this litigation. A check was issued on November 10, 2010 in the amount of $314,464.55 to Johnston Law Office-Trust Account from Slominski's account. the memo line indicates, "Land Rent Texas Property 2011."   The check was issued seven days after Trustee's notice and within the 15-day cure time period. Although Slominski's attorney did not notify Trustee that the lease payment was escrowed in a trust account until November 21, 2011, and it is unclear what date Slominski deposited the money in the trust account, the Court declines to find Slominski breached the lease agreement when the check was issued seven days after Trustee's notification.

42

**D.    Counterclaim**

In his counterclaim, Slominski alleges Trustee has intentionally interfered with Slominski's lease contract with KGLP and continues to do so.   Further, Slominski alleges Trustee's actions constitute a breach of Slominski's lease. Slominski alleges Trustee's interference adversely affects Slominski's rights under the lease and as a result, Slominski suffers damages.   Slominski also claims he incurred significant costs in preparation of the land and made improvements to the land and is entitled to reasonable compensation for his labor and improvements under the lease.   Finally, Slominski requests costs, disbursements and reasonable attorney's fees.   Slominski cites no law or legal argument in support of his counterclaim.   In fact, Slominski did not even address his counterclaim in his post-trial brief.

The Court concludes that although Trustee has aggressively proceeded with his legal claims against Slominski, he has done so within the law.   As noted above, Trustee has established his right to recover under his claims.   There is no tortious interference as a matter of law.   Moreover, even without that conclusion, Slominski failed to establish his counterclaim under the law.

**E.    Remedies**

During closing arguments, the Court inquired about the proper remedy.   The Trustee properly pointed out that the remedy begins with § 550 of the Bankruptcy

43

Code.   "Section 550 of the Bankruptcy Code authorizes a trustee, after avoiding a

fraudulent transfer under . . . § 548, to recover the property transferred or the value of

the property for the benefit of the bankrupt estate."   In re JTS Corp., 617 F.3d 1102,

1111 (9th Cir. 2010) (citing 11 U.S.C. § 550(a)).   The purpose of § 550 is "to

restore the estate to the financial condition it would have enjoyed if the transfer had

not occurred."   Id. (quoting In re Acequia, 34 F.3d 800, 812 (9th Cir. 1994)).   "The

primary goal is equity and restoration, i.e., putting the estate back where it would

have been but for the transfer."   Id. (quoting Collier on Bankruptcy § 550.02[3][a]).

"Abiding its equitable underpinnings, a trustee's recovery under § 550 is limited if

the transferee took the transfer for value in good faith without knowledge of its

voidability."   Id. at 1112 (citing 11 U.S.C. § 550(b)(1)).   "A good faith transferee

is also permitted under § 550 to recover the value of any improvements that were

made after the transfer."   Id. (citing 11 U.S.C. § 550(e)(1)(A)).

Based on the above conclusions, the Court imposes the following remedies.

The estate is entitled to recover possession of the property immediately.   The estate

is also entitled to recover the amount of money due on the lease for 2011.   The

Court understands more than $314,000 of that lease payment is in the trust account

for Slominski's attorney.   That money should immediately be paid over to the

Trustee.   Trustee is also entitled to recover any remaining payment due under the

lease.   At trial, Slominski testified that he was still calculating that amount.

44

The Court also concludes, for the purposes of § 550(e), that Slominski was a good faith transferee.   As such, he would be entitled to a lien on the proceeds of the sale of the property (because the property has already been sold free and clear of any his liens) for the amount of any improvement he made minus the amount of profit he realized, and/or any increase in value of the property as a result of any of his improvements.   11 U.S.C. § 550(e)(1)(A) & (B).   Given the testimony at trial, the Court finds that Slominski has failed to prove the value of the improvements he made to the property.   To the extent he has, that proof was made only in conjunction with the formation of the lease.   As noted above, the Trustee's recovery is limited to what KGLP would receive under the lease.   Thus, any improvement costs — by Slominski's own testimony — have been factored into the lease payment. Slominski has entirely failed to prove the value of any other improvements to the property beyond the crop which is discussed below.   Accordingly, he has failed to show any entitlement to a lien on the proceeds of the sale of property.

The Court finds and concludes that Slominski is entitled to the crop or crops currently on the KGLP land.   However, in order to receive those crops, Slominski must pay the 2011 rent and the pro-rata share of the 2012 rent due under his lease with Grabanski/KGLP.   At a minimum, Slominski would owe for the time which he has used the properties in 2012 to grow the crop until harvest.   At the absolute

45

minimum, this would be based on a pro-rata share of the minimum of the $300,000 payment due under the lease.

The parties, together, have failed to provide the specific proof or the exact numbers needed to carefully and precisely set forth the remedies.   Therefore, the Court has exercised the broad equitable power that is found in the "under-pinnings" of § 550.   See In re JTS Corp., 617 F.3d at 1112 (discussing "equitable under-pinnings" of § 550).   Thus, the Court is not ordering a lease payment by Slominski — as the Trustee requests — under what would have been a fair market lease of at least $490,000 in December of 2010.   Similarly, Slominski will not be awarded the value of items claimed as improvements that he and Grabanski valued for the first time during in-court testimony.   In reaching that conclusion, the Court specifically notes that Slominski had failed to comply with several discovery requests by Trustee relating to documentary support for improvements and other items.   Slominski never provided much of that requested information.

The Court also relies on the "equitable under pinnings" of § 550, along with its additional equitable powers under § 105, to provide additional time for the Grabanskis to vacate the house they occupy.   They shall have 30 days from the date of this order to vacate their home on the KGLP property.   While they have lived, and continue to live rent free, the Court factors in the request of Slominski's counsel to allow a family that includes four children time to orderly vacate.

46

The remedies outlined above dispose of Trustee's remaining two motions. Trustee had moved for authority to act as operating Trustee and take over the management of the crops in the field.   The Trustee had also requested an order preventing Slominski from trespassing to fertilize the growing crops.   As noted above, Slominski is allowed to do what is necessary to harvest the crops so long as he does so without harming the land for future use.

SO ORDERED.

JUDGEMENT SHALL ENTER ACCORDINGLY.

Dated this 7th day of March, 2012.

THAD J. COLLINS
BANKRUPTCY JUDGE
SITTING BY DESIGNATION

47