## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NORTH DAKOTA

In re:

Keeley and Grabanski Land Partnership,

                Debtor.

_____/

Kip M. Kaler, in his capacity as Chapter 7
Bankruptcy Trustee of Debtor Keeley
and Grabanski Land Partnership,

                Plaintiff,

        v.

Louie Slominski,

                Defendant.

_____/

Chapter 7

Bankruptcy No. 10-31482

Adversary No. 11-7021

## ORDER

      This matter is before the Court for a determination of the proper remedy under

11 U.S.C. § 550(e) in a case where the Court has already avoided a lease between

Debtor and Defendant Louie Slominski.   The question presented is whether

Slominski, a good-faith transferee, is entitled to recover for improvements, if any, he

made while he was a tenant on the farmland of Debtor Keeley Grabanski Land

Partnership ("KGLP") before the Court set the lease aside.   The Court heard this

matter at a two-day evidentiary hearing in Fargo, North Dakota.   Plaintiff, Kip

Kaler, represented himself as Chapter 7 Trustee.   Attorney DeWayne Johnston

represented Slominski.   Following the hearing, the Court took arguments and

post-hearing briefing.   This is a core proceeding under 28 U.S.C. § 157(b)(2)(A),

(B), and (C).

## STATEMENT OF THE CASE

The Court decided Trustee's fraudulent transfer claim under § 548 after a

4-day trial in early 2012.   The Court held that the lease between KGLP and

Slominski was a fraudulent transfer under 11 U.S.C. § 548(a)(1)(A) and (B).   See

Kaler v. Slominski (In re Keeley and Grabanski Land P'ship), Bankr. No. 10-31482,

Adv. No. 11-7021, 2012 WL 764442, at *18 (Bankr. D.N.D. Mar. 7, 2012).   The

Court also held that Slominski was a good-faith transferee, and as a good-faith

transferee, was entitled to the crops currently on the KGLP land as his remedy under

§ 550(e).   Id. at *20.

Trustee filed a Motion to Amend that Ruling.   In particular, Trustee asked

that the Court change its Ruling on the remedy to allow the crops to be sold with the

land instead of awarding them to Slominski.   After hearing arguments on the issue,

the Court granted Trustee's Motion and withdrew the portion of the Ruling relating

to the rights and entitlements to the growing crops.   The Court instead allowed the

growing alfalfa crop to be sold free and clear as a part of the sale of one of the two

KGLP parcels of land.   The Court left open the question of entitlement to the wheat

2

crop.   It also left open the question of further remedies, including Slominski's claim

as a good-faith transferee for his cost of improving the land under § 550(e).   This

resulted in the two-day evidentiary hearing focused on this narrow issue.   For the

following reasons, the Court decides that Slominski is entitled to recover

$147,377.95 of the proceeds from the sale of the land and/or crops.

## PROCEDURAL BACKGROUND

The Court's original ruling, on March 7, 2012, originally decided the remedy

issue as follows:

> The estate is entitled to recover possession of the property immediately.
> The estate is also entitled to recover the amount of money due on the
> lease for 2011.   The Court understands more than $314,000 of that
> lease payment is in the trust account for Slominski's attorney.   That
> money should immediately be paid over to the Trustee.   Trustee is also
> entitled to recover any remaining payment due under the lease.   **At
> trial, Slominski testified that he was still calculating that amount.**
>
> The Court also concludes, for the purposes of § 550(e), that Slominski
> was a good faith transferee.   As such, he would be entitled to a lien on
> the proceeds of the sale of the property (because the property has
> already been sold free and clear of any [*sic*] his liens) for the amount of
> any improvement he made minus the amount of profit he realized,
> and/or any increase in value of the property as a result of any of his
> improvements.    11  U.S.C.  §  550(e)(1)(A)  &  (B).   Given  the
> testimony at trial, **the Court finds that Slominski has failed to prove
> the value of the improvements he made to the property.**   To the
> extent he has, that proof was made only in conjunction with the
> formation of the lease. As noted above, the Trustee's recovery is
> limited to what KGLP would receive under the lease. **Thus, any
> improvement costs—by Slominski's own testimony—have been
> factored into the lease payment. Slominski has entirely failed to
> prove the value of any other improvements to the property beyond
> the crop which is discussed below.   Accordingly, he has failed to**

3

**show any entitlement to a lien on the proceeds of the sale of property.**

The Court finds and concludes that Slominski is entitled to the crop or crops currently on the KGLP land. However, in order to receive those crops, Slominski must pay the 2011 rent and the pro-rata share of the 2012 rent due under his lease with Grabanski/KGLP.   At a minimum, Slominski would owe for the time which he has used the properties in 2012 to grow the crop until harvest.   At the absolute minimum, this would be based on a pro-rata share of the minimum of the $300,000 payment due under the lease.

The parties, together, have failed to provide the specific proof or the exact numbers needed to carefully and precisely set forth the remedies. Therefore, the Court has exercised the broad equitable power that is found in the "under-pinnings" of § 550.   See In re JTS Corp., 617 F.3d at 1112 (discussing "equitable under-pinnings" of § 550).   Thus, the Court is not ordering a lease payment by Slominski—as the Trustee requests—under what would have been a fair market lease of at least $490,000 in December of 2010.   Similarly, **Slominski will not be awarded the value of items claimed as improvements that he and Grabanski valued for the first time during in-court testimony.**   In reaching that conclusion, the Court specifically notes that Slominski had failed to comply with several discovery requests by Trustee relating to documentary support for improvements and other items. Slominski never provided much of that requested information.

Id. at *20–21 (emphasis added).

On March 12, 2012, Trustee filed his Motion to Amend that Ruling.   Trustee argued there were several errors in the Ruling.   Trustee first asserted that Slominski was not a good-faith transferee entitled to relief under § 550(e)(1).   Trustee also argued that the Court failed to require Slominski to pay the fair market value ($495,000) for the 2011 lease, and instead required only the smaller payments under the 2010 lease avoided by the Ruling.

Trustee also asserted that the Court's conclusion that "Slominski is entitled to the crop or crops currently on the KGLP land" failed to distinguish between the winter wheat Slominski planted in November 2011 and the alfalfa planted prior to Slominski's tenancy, in which Slominski had intermixed winter wheat.   Trustee argued the Court failed to consider that the alfalfa crop was not planted by Slominski and therefore he should not be allowed to harvest it.   Trustee asked the Court to amend its Order to clarify what crops Slominski could retain, and he encouraged the Court to deny Slominski any part of the alfalfa.

Trustee also filed a Request for Expedited Consideration of the Motion to Amend.   Specifically, Trustee sought expedited consideration of the portion of the Motion to Amend related to the crops.   <u>See</u> ECF Doc. #70.   By Affidavit, Trustee represented that the Court's decision impaired Trustee's ability to finalize a sale of the Unruh property.[1]   He noted that his negotiated agreement with the buyer required immediate possession of the real estate and the alfalfa.   The prospective buyer and Trustee agreed that failure to deliver the alfalfa would constitute a material breach of that purchase agreement.   Trustee argued that if the issue of the alfalfa was not resolved quickly, the prospective buyer would withdraw from the

---

[1]The Unruh property has alternately been referred to in these proceedings as the Lamar County property.

sale.   The Court granted Trustee's Motion for Expedited Consideration and heard it on March 19, 2012.

The next day, the Court ruled on the Motion to Amend.   The Court declined to reconsider or amend its conclusion that Slominski was a good-faith transferee entitled to a remedy under § 550(e)(1).   The Court also declined to reconsider or amend its ruling on the amount Slominski owes for renting the land in 2011.

The Court did, however, grant Trustee's Motion to Amend as it addressed treatment of the growing crops.   The Court withdrew the portion of its March 7, 2012 Ruling relating to the rights and entitlements of the parties to the crops and replaced it with the following:

> As the Trustee points out, the Court approved the sale of the land and all crops, except the wheat crop, free and clear of all liens.[2]   This means the growing alfalfa crop has been sold free and clear of all liens and may be harvested by the party purchasing the Unruh property.
>
> This does not mean [Slominski] has no claim to, or remedy available from the sale proceeds of the Unruh property for the improvements [Slominski] made to the land and/or the alfalfa crop.   [Slominski] will be given the opportunity to present proof of any such right or claim. The entitlement to the unharvested wheat crop on both the Lenth and Unruh parcels will also be considered in further proceedings to determine the remedy available under § 550(e)(1).

---

[2] Trustee filed a Motion to Sell Free and Clear of Liens and Encumbrances relating to the Lamar County/Unruh property in In re Keeley and Grabanski Land P'ship, Bankr. No. 10-31482, on February 2, 2012.   See ECF Doc. #191.   The Court granted the motion on March 2, 2012.   See ECF Doc. #226.

> As the Court noted in its March 7, 2012 ruling, neither party has
> provided the necessary evidence to make full and proper
> determinations about the remedies available under § 550(e)(1). The
> Court will hold an evidentiary hearing and argument on those issues in
> order to properly develop the record.

ECF Doc. #82.

Slominski then filed a Motion for Clarification of that Order. Slominski asserted the Court made an error of law in finding that the purchasing party was entitled to harvest all crops on the KGLP land. Slominski argued he was entitled to harvest because he planted the crops during his tenancy on the land. Trustee opposed the relief requested by Slominski. However, Trustee joined in the request that the Court issue a more extensive and directive order. Trustee sought a directive that Slominski had no possessory interest in the alfalfa or the wheat. Trustee further sought direction about who was to care for and harvest the wheat. Trustee noted that having Slominski on the land and doing what he thought was needed—in direct opposition of what Trustee was told was needed—was simply unworkable.

The Court heard the matter on March 27, 2012, and issued an Order for Interim Relief on March 29, 2012. The Court ordered that Trustee had sole possession and control of all the bankruptcy estate's real property with its improvements. The improvements included "growing or to be grown crops (alfalfa and wheat inclusive)." The Court further ordered that Trustee was authorized to care for and harvest the growing wheat crop.

On June 21, 2012, Trustee filed yet another Motion to Amend/Reconsider Partial Judgment.   Trustee asserted that Slominski was not entitled to a lien for improvements to the property until the bankruptcy estate has been restored to its pre-fraudulent-transfer condition.   Specifically, he argued the estate should recover the full value of appropriate market rent as of the date of the original transfer (December 2010) plus all fair market rents the estate would have received after the transfer including the market value rent for 2011 and 2012.   The Court denied Trustee's motion and set a hearing on the remaining remedy issue.

The Court held an evidentiary hearing on Slominski's claim for improvements under § 550(e) on July 17–18, 2012.   The parties submitted post-hearing briefs.

## FINDINGS OF FACT

### 1.    Factual Background From Previous Hearing

The Court made extensive factual findings about the history of KGLP in its March 7, 2012 Order.   See generally In re Keeley and Grabanski Land P'ship, 2012 WL 764442.   A brief recitation of some of these facts provides context for the case at this stage.

### A.    Background on KGLP

Sometime in 2006 or 2007, Tom Grabanski and John Keeley—both farmers from the Grafton, North Dakota area—entered into two partnerships geared toward

farming in Texas.   These two men, with their wives, Mari Grabanski and Dawn Keeley, formed two partnerships, G & K Farms ("G & K") and Keeley and Grabanski Land Partnership ("KGLP").   G & K was set up to serve as the company that operated the Texas farms, and KGLP was set up to hold whatever land they bought for farming.

KGLP bought two large parcels of land in Texas.   The two parcels are referred to throughout these proceedings as the Lenth property and the Unruh property.   The Lenth property is approximately 2000 acres, including 1700 tillable acres and six irrigation pivots that KGLP or G & K bought and placed on the property.    The Unruh property is approximately 1600 acres and one-third of it is irrigated.   KGLP or G & K bought three large grain bins, scales, and a scale house that they placed on the Unruh property.

G & K began farming the KGLP land in late 2007 or early 2008.   By early 2009, the Keeleys decided they wanted out of the partnerships with the Grabanskis. In September 2009, the Keeleys assigned and transferred all their interest in both G & K and KGLP to the Grabanskis.

The Grabanskis fell behind on many of their G & K obligations soon after the Keeleys transferred their partnership interest to the Grabanskis.   Eventually, the Grabanski's financial problems overwhelmed them.   They lost their North Dakota farming operations and filed for personal bankruptcy on July 22, 2010.   The

Grabanskis relocated to Texas and took up residence on the Unruh property.   Their

intention was to farm the Lenth and Unruh properties through Texas Family Farms

(successor to G & K) and KGLP.

### B.    Slominski Becomes Involved with the Texas Farming Operation

Part of Grabanski's plan to make the Texas farming operation successful was

to utilize the services of Louis Slominski.   Slominski was, and is, a close friend of

the Grabanskis.   He owns a farm and lives in Minto, North Dakota.   Minto is

approximately ten miles from Grafton, North Dakota, where the Grabanskis lived

for many years.   Slominski and Grabanski had known each other for several years

through the community and, in particular, through farming.   They entered into a

farming partnership together in the Fargo area.   Slominski became a good friend

and confidante of Grabanski.

As Grabanksi was attempting to get the Texas operation going for the 2010–

2011 crop year, he needed assistance from Slominski to do some custom planting.

Slominski and a crew of three men with a planter went from North Dakota to the

Texas properties in August 2010.   They prepared to do the custom planting work

and planned to return to North Dakota as soon as they finished.   However, because

the Grabanskis had not kept current on G & K's obligations to Choice Financial,

their primary lender, Choice had been pursuing collection efforts against them.

This culminated in Choice seizing virtually all of the Grabanski's farming

equipment from the Texas properties.   This halted the Grabanski's harvest.

Choice removed the harvested crop and damaged the land in doing so.

Slominski was still on-site in Texas when Choice seized virtually the entire

Grabanski farming operation.   Grabanski was unable to farm the land, and

Slominski stepped in to help his friend.   Slominski essentially went from a custom

planter assisting Grabanski to the operator of the farming operation almost

overnight.   There were several crops that still needed to be harvested, and

Slominski completed the necessary work.

Several months into this arrangement, Slominski and Grabanksi entered a

three-year lease.   It began on December 1, 2010 and expired on November 1, 2013.

The lease required Slominski, as the tenant, to pay KGLP, the landlord, 20% of the

gross proceeds derived from the land, with an annual minimum payment of

$300,000.   Slominski signed the lease factoring in the amount of money that would

be required to make improvements to the land.   After signing the lease, Slominski

hired Grabanski as his farm manager.   During this same period, Grabanski did not

make payments on the Lenth property.   The Lenths began foreclosure proceedings.

To prevent the foreclosure sale, the Keeleys filed an involuntary bankruptcy petition

against KGLP on December 6, 2010, one day before the foreclosure sale was

scheduled.

### 2.      Testimony at Evidentiary Hearing on Remedy

#### A.      The Condition of the Real Property

Grabanski and Slominski both testified again and reiterated that when
Slominski stepped in to help Grabanski, the property was damaged from Choice's
repossession of Grabanski's equipment, requiring considerable work to make it
usable.   Kalin Flourney, a Texas farmer and later, the real estate broker for Trustee
in the sale of the property, testified that the ruts in the land were not unique for this
type of heavy Texas clay soil.   He explained that this is a key reason that no-till
crops are uncommon in the area.   Flourney saw the property three or four times
between October and December 2010.   He noticed the baler and tractor tire tracks
on the property, but did not believe they were unusual.   Flourney said Texas
farmers simply disc them out.

#### B.      Slominski's Expenses and Claims of Improvement

Slominski testified again at length about his farming operation on the KGLP
land.   He focused on his expenses and the improvements he believes he made.
Slominski asserted that he ditched the Lenth property to increase the farmable acres
and to allow irrigation pivots to run.   Slominski also leveled dirt to get rid of steep
banks after the ditching was finished.   He also flattened the roads that had
previously been used as dikes but were no longer needed.   All this allowed him to
use larger farming equipment because he could "plant straight through."

12

Slominski also used "disc leveling" to further flatten and soften the land. After discing the land, Slominski says he harrowed the land to prevent it from hardening and to prepare a proper seed bed.   Slominski noted he also removed trees from the outside edge of the land to increase the number of plantable acres by 20–30 acres.

Of particular relevance here, Slominski said he sprayed the land before planting, planted winter wheat, and applied chemicals to the wheat after planting. He determined the costs of each of these tasks on either a per-acre or hourly basis,[3] which included equipment, labor, and fuel costs.   Crop insurance on the Lenth property cost $25,690.   The total cost for the work on the Lenth property, including insurance, was $266,658.

On the Unruh property, Slominski claims he planted winter wheat on 550 acres at a total cost of $167,958.   He also planted wheat straw into 930 acres of existing alfalfa.   Slominski testified that many area ranchers want cattle feed, and mixing wheat in the alfalfa increases the bulk and nutritional value of the hay.   He asserted his total cost of the wheat straw/alfalfa crop on the Unruh property was $129,082.60.   Slominski's work on the Unruh property also included spraying for weeds on an 88-acre horse pasture.   He said that the plan for the pasture was for

---

[3] See Exh. 102 for individual costs for specific tasks.

13

chemical fallow to prepare it for planting later.   He also disced and harrowed the pasture.   His total cost related to the pasture was $3,608.

Slominski also noted unexpected repair costs that he covered.   In March or April 2011, a windstorm brought down two irrigation pivots and two towers tipped over.   Slominski testified a third party was going to charge $100,000[4] for the repairs, so he repaired it himself with hired help.   His repairs to the irrigation equipment cost $37,851.09.[5]   This includes $20,000 in labor for Slominski and five other workers for two weeks.

Slominski introduced an exhibit detailing his total expenses related to the Lenth and Unruh properties.   See Exh. 102.   Slominski's bookkeeper provided the receipts used to create the exhibit.   A summary of the categories of his expenses shows physical additions or changes to the property of $1,359,466.16, repairs to the property of an unknown amount, taxes of $14,879.95, and preservation of the property of $1,409,453.91.   These amounts total $2,783,800.02.   Slominski claims this number represents all of his Texas farming expenses.

---

[4] In the March 7, 2012 Order, the Court found that Slominski testified that a service technician estimated the cost of the repair would be between $30,000 and $40,000, so he decided to repair it himself.   In re Keeley and Grabanski Land P'ship, 2012 WL 764442, at *20.

[5] Slominski identified $850 for a bale that should have been deducted from this total. The total irrigation equipment repairs therefore totaled $37,001.09.

In late 2011, Flourney visited the land.   He noted it had been v-shaped or "hurricane" ditched.   He stated that this type of ditching is not typical for the area and that Texas farmers usually use an angled blade.   He said these ditches probably added little or nothing to the value of the land going forward.   He stated that ditches are not permanent, but instead are good for one crop cycle.

Grabanski testified, however, that he felt the property was improved by his and Slominski's efforts.   Specifically, these efforts combined several smaller fields into a few larger fields.   Grabanksi believed that the ditching added value to the land and assisted Trustee in ultimately selling it.   Grabanski provided no evidence of how much these things increased the value of the land or how the increased value could be measured.

### C.      Whether Slominski Improved the Value of the Real Property

KGLP originally bought the Lenth property in February 2007 for $2,340,000. Later that year, KGLP bought the Unruh property for $4,500,000.   Together, the parcels cost KGLP $6,840,000.

After the involuntary bankruptcy filing against KGLP in December 2010, the Court appointed an operating Trustee.   Trustee hired Flourney as his broker to sell KGLP's land.   Flourney testified that in March 2011—four months after the filing—US Farming Realty offered to buy both the Lenth and Unruh properties for a total of $8,000,000.   The sale was contingent on a lease free property.   The sale fell

15

through when Slominski refused to give up the lease he signed in December 2010.

That resulted in this adversary proceeding where Trustee has successfully set aside

the lease as a fraudulent transfer.

Trustee eventually sold the properties separately to buyers that Flourney

found through advertising.   John Chester bought the Unruh property for

$4,500,000, the same price that was contemplated in the proposal for the Unruh

property in the March 2011 sale.   A closing date was set in late March 2012.   The

sale did not include the wheat crop, but did include the alfalfa crop with the wheat

straw planted in it.   Chester testified that the wheat straw had been oversown into

the alfalfa.

Chester testified that in negotiating the sale, he placed no value on the wheat

straw in the alfalfa crop.   He stated that the wheat straw makes it difficult to sell the

hay.   Chester testified that no one in the area wants wheat in alfalfa hay because it

depletes moisture from the second alfalfa cutting.

At the time Chester negotiated the purchase in February 2012, he planned to

bale the alfalfa.   He testified that he anticipated between five and six cuttings from

the alfalfa crop per year.   In the first cutting after the sale, he estimated the harvest

was approximately two tons per acre.   He had only sold between 30% and 40% of

the wheat-alfalfa mix at the time of the hearing.   Chester noted that in the future, he

was unsure whether he would continue to grow the alfalfa or plant a more conventional row crop such as corn.

Chester noted that receiving the alfalfa crop with the land was an important term of the sale.  It provided income to make the land payment.  If Slominski was allowed to harvest the alfalfa crop to sell, Chester says he would not have had a source of income from the land.

Grabanski testified that he believed putting wheat into an alfalfa crop was beneficial.  He claims it increases product and tonnage.  He believes the second alfalfa cutting is the best—not the first.  He said there are more weeds in the first cutting.  Grabanksi asserted that based on production in previous years, Chester would have only harvested three-fourths of a ton per acre if the crop was alfalfa only.  Although Chester testified there was no market for the alfalfa with wheat straw, Grabanski disagreed.  He expressed a belief that he and Slominski could have easily sold it.  Grabanski made this assertion even though he had no prior experience selling wheat straw with alfalfa.  Grabanski claimed he and Slominski had interested buyers, but could not enter into a contract because of the uncertainty of ownership.  Grabanski produced no document or testimony to support these assertions.

The Lenth property eventually sold for $3,300,000.  Flourney provided his opinions about why the property ultimately sold for $200,000 less than the March

17

2011 offer.   He stated that after the offer in March 2011, one irrigation pivot was destroyed, two towers were down, and two towers were missing.   He also noted the poor quality of the wheat on the farm from November 2011 to mid-March 2012 was a factor.   He said prospective buyers suspected that the poor condition of the land was causing the poor wheat crop.   He believes the land quality was poor because it was starving for nitrogen.

Flourney said that between April 2009 and March 2012, the farm land in eastern Texas generally increased in value by about $150 per acre.   He admitted that land prices in the last year of that period—between March 2011 and March 2012—were fairly consistent.

### D.    The Value of the Rent for 2012

One key question on the remedy available to Slominski is the amount of rent he should pay for his continued farming and possession into June of 2012.   Trustee called Pat Murphy, an appraiser who specializes in Texas farm land.   Murphy testified about the market value of the land—and thus the appropriate value of the lease.   Murphy noted that there are two separate crop years in Texas.   The first is November–June, and the next is June–end of October.   Murphy said the first time period was the prime time when most farmers hoped for the biggest profit.   By June 15, the first crop is taken off, and this is the cream of the crop.   The first cutting of alfalfa likewise has the most value.

18

Murphy explained that in most crop years between early November and December is the ideal time to start the "first crop year."   If a farmer is seeding wheat, he said, it needs to be started no later than December 1, but November 1 is better.   If real estate is sold in the middle of the first crop—like it was here—it negatively affects the sale price.   The reason is simple:   the first crop provides the best chance of a profit for that year.   Any buyer would pay less for the land if he did not get the crop.

Murphy did not have comparable leases for the period at issue here because farmers simply do not negotiate leases from November to June (the best season only).   Murphy's estimate of the market rent Slominski should have paid for the Lenth and Unruh properties from November 1, 2011 to June 15, 2012 was $304,400. Slominski provided no competing valuation.

### E.   Harvesting the Wheat and Alfalfa Crops

This matter and the remedies at issue here were further complicated after the Court granted Trustee's expedited motion for immediate possession of all the growing wheat on the Unruh and Lenth properties.   Trustee ensured that the wheat crop was tended and harvested.   Trustee hired Murphy to manage those wheat crops and supervise the harvest.   Trustee vacated the Unruh property to turn it over to Chester in mid-June when the harvest was complete.   Trustee had previously

vacated the Lenth parcel.   The net income (sale price less chemicals, harvest costs, and management fees) to the KGLP estate from the wheat crop was $442,218.09.

There is no dispute that the Grabanskis remained on the property and Slominski had some control over it until June 2012.   Before the Court turned control of the crops over to Trustee in late March 2012, Slominski was farming all the land—and anticipating a harvest.   The Court, at Trustee's request, removed Slominski from the crop land after mid-March.   Slominski believes his input and time should be compensated for the entire period in which he farmed the KGLP land.

## CONCLUSIONS OF LAW

This proceeding is about the proper remedy, if any, for Slominski as a good-faith transferee under § 550(e).

Section 550(e) provides:

(e)(1) A good faith transferee from whom the trustee may recover under subsection (a) of this section has a lien on the property recovered to secure the lesser of–

   (A)   the cost, to such transferee, of any improvement made after the transfer, less the amount of any profit realized by or accruing to such transferee from such property; and

   (B)   any increase in the value of such property as a result of such improvement, of the property transferred.

   (2) In this subsection, "improvement" includes–

   (A)   physical additions or changes to the property transferred;

(B)    repairs to such property;

(C)    payment of any tax on such property;

(D)    payment of any debt secured by a lien on such property that is superior or equal to the rights of the trustee; and

(E)    preservation of such property.

11 U.S.C. § 550(e) (2012).   Slominski bears the burden of establishing his entitlement to a lien on the property under § 550(e).   See Braunstein v. Crawford (In re Crawford), 454 B.R. 262, 276 n.8 (Bankr. D. Mass. 2011); Sanders v. Hang (In re Hang), Bankr. No. 05-30655, Adv. No. 06-02274-C, 2007 WL 2344958, at *6 (Bankr. E.D. Cal. Aug. 16, 2007).

Before reaching the merits of the real question of remedy under § 550(e) that prompted the hearing, the Court once again must address an issue Trustee continues to argue—whether Slominski can be considered a "good-faith transferee" at all or for only a limited part of the time he farmed under the lease.

**A.    Slominski as a Good-Faith Transferee**

Trustee continues to persist in his position that Slominski was not a good-faith transferee.   The Court has ruled against Trustee on that question several times. While he still argues Slominski was not a good-faith transferee at the time the lease began on December 1, 2010, Trustee now concentrates most of his energy arguing that the good-faith status of a transferee may change over time and did so in this

21

case.   Trustee argues Slominski lost his good-faith transferee status when the

Summons and Complaint in this adversary proceeding were served on Slominski in

August 2011.   Trustee concludes Slominski cannot recover for improvements made

to KGLP land after time because he was no longer a good-faith transferee.

Trustee specifically argues that by the time Slominski was sued, he was aware

of more than enough facts to know that he could no longer be a good-faith transferee.

He contends that the suit provided Slominski with specific notice of the avoidability

of the transfer at that time.   At that point, Trustee argues Slominski knew or should

have known about the KGLP bankruptcy and Slominski took the risk that any

further work he did on the land was no longer protected by good-faith transferee

status.   Thus, Trustee concludes, Slominski's recovery should be limited to only

those items he provided to KGLP land between December 1, 2010 and August 2011.

Slominski asserts that Trustee's proposed rule is completely unworkable and

without merit.   He notes that it would result in a rule where anyone who gets sued

must quit farming on their leased land.   Slominski claims he took lease transfer in

good-faith and was entitled to proceed on that basis until Trustee provides that it was

improper.

In discussing the application of § 550(e), the Eighth Circuit B.A.P. noted:

"Good faith is not defined in the Bankruptcy Code."   <u>Doeling v. Grueneich</u> (<u>In re</u>

22

Grueneich), 400 B.R. 688, 693 (B.A.P. 8th Cir. 2009).   Instead, "it is determined on

a case-by-case basis."   Id.

> A transferee does not act in good faith if he has sufficient knowledge to
> place him on inquiry notice of the debtor's possible insolvency.
> Whether a transferee has such knowledge is determined objectively,
> with a focus on what a transferee knew or should have known, not on
> the transferee's actual knowledge.

Id. (footnotes omitted).   The transferee of a fraudulent transfer has the burden of

proving good faith.   Id.

The Court has already found that Slominski met that burden, and he qualifies

as a good-faith transferee.   Trustee now has the burden of showing Slominski lost

that "good-faith transferee" protection at some point between the time of the transfer

and the Court setting the transfer aside.   While Trustee essentially asserts that the

standard for determining a good-faith transferee continually applies after the transfer

occurs and can be lost with changing events, Trustee offers no support for that

position.

Without such authority, the Court finds Trustee's suggested rule is fraught

with practical difficulties.   This case provides a good illustration.   If Slominski, as

a good-faith transferee, put some investment in the land and crops, but was later put

on notice that there could be problems with the transfer, he is left with a Hobson's

choice.   He either walks away and leaves it to someone else to protect his

investment—and make it profitable for him—**or** he stays with the arrangement to

see his investment through and make it as profitable as he can while risking losing all additional efforts and investment he puts in.   This does not provide a good legal rule or a fair result.   However, if the law allows the good-faith transferee to continue protecting his investment and making it more profitable, even after he or she becomes aware of the problems, the estate and transfer investor are both protected.   The transferee gets the benefits of his own work, and the estate property is either better off or no worse off.

Trustee's argument for another rule does not make sense in this case. Trustee essentially wants language added to the Code—to establish that good-faith status can be lost if Trustee brings an avoidance action—that is not there now.   The Court declines to read that language into the Code.   As a result, Trustee cannot limit Slominski's recovery to improvements made before Trustee filed suit in August 2011.

**B.      Trustee's Recovery is Reduced by Good-Faith Transferee's Cost of Improvements or Increase in Value of the Land—Whichever is Less**

The amount of a Trustee's recovery is well established.   Section 550 of the Bankruptcy Code authorizes a trustee who succeeds in avoiding a fraudulent transfer under § 544 or § 548 to recover the property transferred or the value of the property for the benefit of the bankruptcy estate.   Section 550(a) provides that "to the extent that a transfer is avoided under section 544 . . . [or] 548 . . . the trustee may recover,

24

for the benefit of the estate, the property transferred, or, if the court orders, the value

of such property."   The Ninth Circuit Court of Appeals explained:

> The purpose of § 550 is "to restore the estate to the financial condition
> it would have enjoyed if the transfer had not occurred." In re Acequia,
> 34 F.3d 800, 812 (9th Cir. 1994) (internal quotation marks omitted).
> The primary goal is equity and restoration, i.e., "putting the estate back
> where it would have been but for the transfer."   Collier on Bankruptcy
> § 550.02[3][a] at 550–10; 11 U.S.C. § 550(e)(1)(A); In re Integra
> Realty Res., Inc., 354 F.3d 1246, 1266 (10th Cir. 2004); In re American
> Way Serv. Corp., 229 B.R. 496, 530–31 (Bankr. S.D. Fla. 1999).

Decker v. Tramiel (In re JTS Corp.), 617 F.3d 1102, 1111–12 (9th Cir. 2010).

However, the same court recognized the statutory and equitable limits on

Trustee's recovery in the case of good-faith transferees, like Slominski here.

> Abiding its equitable underpinnings, a trustee's recovery under § 550 is
> limited if the transferee took the transfer for value in good faith without
> knowledge of its voidability.   11 U.S.C. § 550(b)(1).   **A good faith
> transferee is also permitted under § 550 to recover the value of any
> improvements that were made after the transfer. 11 U.S.C.
> § 550(e)(1)(A).**

Id. (emphasis added).

When applying § 550, "the amount of recovery must be calculated to the

extent that it benefits the estate, as § 550 expressly requires, and must further the

intent of § 550 to promote equity and restore the estate to its prior condition."

Decker, 617 F.3d at 1115.   "Allowing the estate to profit by taking value that should

be returned to a good faith transferee does not promote the purpose of § 550 to

restore equity."   Id. at 1116.   Stated another way:   "Bankruptcy Code § 550 has

several provisions that explicitly limit a plaintiff's recovery, including the right of a good faith transferee to retain the value of any improvement to the property after the transfer (less the transferees profit) . . ." In re Tronox, Inc., 464 B.R. 606, 618 (Bankr. S.D.N.Y. 2012).   All of this recognizes "that the purpose of fraudulent transfer law is remedial rather than punitive."   Id. (going on to note that courts have even allowed non-good-faith transferees some set-off to establish equity).

Slominski asserts that the amount of his recovery should include **all** improvements he made to KGLP's land, to the estate's other property, and to the crops he sowed and tended.   Slominski acknowledges there should be some adjustment to his award for proper rent he should pay to the estate.   He believes that would only reduce, not negate, his improvement claim.

Trustee asserts the opposite.   He claims that Slominski is not entitled to a lien on the property at all.   He alleges that none of Slominski's improvements increased the value of the property.   He claims Slominski owes him for the 2012 rent.

Trustee argues it is easy to show Slominski to should get nothing.   Under § 550(e)(1), a good-faith transferee is entitled to a lien only to secure the **lesser** of subsections (A) and (B).   Section 550(e)(1)(B) refers to "any increase in the value of such property as a result of such improvement."   Trustee argues there was no increase to the value of the property as a result of Slominski's improvements, and thus Slominski is not entitled to a lien as a matter of law.   Trustee reasons that the

26

"lesser" of (A) the cost of Slominski's improvements and (B) a $0 increase in land value from improvements, would necessarily be $0.

### C.     The Court Cannot Determine Whether Alleged Improvements Increased the Value of the Real Property

The analysis, therefore, must start with the value of the property at the time of the transfer, December 1, 2010.   Only improvements that increased the value from that time forward are relevant.   Neither party, however, has offered evidence of the value of the real property on December 1, 2010.   The only evidence offered on value of the property is:

> KGLP paid a total of $6,840,000 for the two properties in 2007; the property had a value in March 2011 of $8,000,000, based on a purchase offer by US Farming Realty; and the bankruptcy estate ultimately received $7,800,000 from the sale of the property in March 2012.

Although the property sold for almost $2,000,000 more than KGLP's purchase price, five years separated the sales.   This is not a measure from the transfer date in December 2010, but from a sale price two years earlier.   Similarly, Trustee's evidence that farm land in eastern Texas increased in value between April 2009 and March 2012 approximately $150 per acre is unpersuasive because it does not speak to the proper time period.   Based on the evidence before the Court, it is impossible to say precisely what the value of the property was on December 1, 2010.   The Court, therefore, can make no finding at all about whether the property increased in

value during the relevant time—let alone whether any such increase was the result of "improvements" by Slominski.

In the end, the language of § 550(e)(1) that a good-faith transferee is entitled to a lien only to secure the "lesser" of subsections (A) and (B), is not relevant because there is no value in the record from which the Court can determine (B). The Court is thus left to determine only whether Slominski has made a sufficient showing under (A)—costs of any improvements he made after the transfer (less his profit that he realized or is accruing).

### D.   Value of Improvements Made After Transfer Recoverable under § 550(e)(1)(A)

Again, case law provides context and direction for this analysis and how to determine whether there were improvements and in what amount.   Section 550 defines the "liabilities of transferees of avoided transfer" but provides "several safe harbors" for transferees.   In re Cohen, 199 B.R. 709, 719 (B.A.P. 9th Cir. 1996). One of those safe harbors is § 550(e)(1)(A), which allows good-faith transferees to recover for "improvements" to estate property.   See Id.   Improvements are defined in § 550(e)(2).   "Improvements are broadly defined to include payment of taxes, payment of certain senior secured debt, and expenses of preservation of the estate." Id.   As one court noted:

> The definition of "improvements" under § 550(e) is not bounded or limited by state law . . . . Rather 550(e) has its own definition of "improvements" which leaves to the trial court considerable discretion

28

as to what is "included" within the definition. In most cases, this broad definition of "improvements" will inure to the benefit of entities who find themselves liable to return to the estate property previously acquired from the Debtor.

In re C.W. Mining Co., Bankr. No. 08-20105 RKM, 2010 WL 3123140, at *16 (Bankr. D. Utah Aug. 6, 2010).   The intent of § 550(e) is to prevent a "windfall" to the estate or its creditors.   In re Farrell, 269 B.R. 181, 188 (Bankr. S.D. Ohio 2001); see also In re Interstate Cigar Co., 285 B.R. 789, 796 (Bankr. E.D.N.Y. 2002) (citing 5 Colliers on Bankruptcy ¶ 550.06, (15th ed. 2002).

The most analogous case to the one before this Court is a Ninth Circuit fraudulent transfer case in an agricultural setting somewhat similar to this case. In re Black & White Cattle Co., 783 F.2d 1454, 1461 (9th Cir. 1986) (applying § 550(d), which is now § 550(e)).   The Ninth Circuit held that a good-faith transferee was entitled to an improvement lien for expenses incurred in feeding cattle.   Id.   The Ninth Circuit reversed the bankruptcy court's denial of transferee's "request for a lien for $432,058.02, the amount the cattle increased in value as a result of [transferee's] expenditures for care and feeding while the cattle were in [debtor's] possession."   Id.   Thus, this Court believes Slominski is entitled to improvement costs for planting and nurturing the crops.

Slominski provided exhibits and testimony at trial that claimed every expense he thought he incurred in farming KGLP's land.   His exhibits, however, showed his total contributions to the Texas farming operations to be more than $2,700,000.   As

29

the Court noted at the close of the evidence, that amount is not supported by the credible evidence in the record and far exceeds the amount of crop costs which the Court noted was the sole issue.   Nearly $2,200,000 of Slominski's total cost was for discing, ditching, and reworking the land.   These amounts were based on estimates by Slominski and Grabanski for the value of their time and effort.   They provided almost no evidence that this work, in fact, "improved" the land at all.   Trustee's witnesses, with many more years of Texas farming experience, noted that this work provided little or no actual improvement or value.   The Court concludes this work was ordinary farm work that prepped the fields for planting, not improvements that altered the land value.

Even if the Court believed the ditching, discing, and related categories of work did improve the land, the Court would still not award the claimed $2,200,000 of costs.   Slominski and Grabanski both specifically testified in the first trial—on the avoidability of the transfer under § 548—that the annual amount of rent under the lease was purposely low to factor in the work Slominski would need to do to bring the land to good production.   The Court noted that Slominski and Grabanski had not proven this value with credible evidence and simply created the evidence for trial.   They described that work as discing, ditching, and the exact same things they now claim are improvements.

In the first trial, they valued the work far below the $2,200,000 they now claim—and the Court already rejected that lower number as not credible.   They cannot now credibly testify that the same work "encompassed in the lease price" resulted in a $2,200,000-plus cost to make the alleged improvements.   The Court rejects this claim in its entirety.

In the previous Rulings, the Court specifically noted that the **only** costs the Court believed to still be at issue in this remedy portion of the case were those relating to the crops in the field.   The evidence submitted by Grabanski and Slominski revealed that those crop costs were: $266,658 for the Lenth property; $167,958 for the wheat crop on the Unruh property; and $129,082 for the wheat planted into the alfalfa.   The total Slominski claimed for the crop "improvements" under § 550(e) was thus $563,698.   The Trustee has challenged those amounts, but the Court finds they are credible and adopts them as Slominski's expenses under § 550(e)(1)(A).   The Court also will allow the $14,879.95 in property taxes Slominski paid.   See § 550(e)(2)(c).   Slominski's total claim under § 550(e)(1)(A) is thus $578,577.95.

The Court's previous Rulings also noted, and the Court reiterates here, that any award to Slominski under § 550(e) is contingent upon the payment of rent for 2011 and the partial 2012 year.   While the Court previously found, in the exercise of its equitable judgment, that Slominski could pay rent for 2011 under the original

31

2010 Slominski-KGLP lease that the Court set aside, Trustee has repeatedly urged

the Court to require the 2011 rent to be paid under the fair market value of $490,000.

Trustee points out that this is the only way the Court's decision can be consistent

with the above recited case law.   That case law notes that the avoidance of the lease

must place the estate in:   "The condition it would have enjoyed if the transfer had

not occurred."   Decker, 617 F.3d at 1111.   The Trustee correctly points out that the

only way to put the estate back in that position is to have Slominski pay what would

have been the fair market value for the lease of the KGLP property in 2011 and part

of 2012.   The Court, therefore, reverses its previous decision on the 2011 lease

value and applies the fair market value of $490,000.

Slominski owes, thus, $490,000 for 2011 rent.   Trustee claims Slominski

owes $304,000 for a partial year's rent for 2012.   This amount came from Trustee's

expert.   However, this is not entirely consistent with the record.   While the number

is a simple division of the annual rent over the period Trustee believes Slominski had

the land November 2, 2011 to June 15, 2012, that $490,000 of annual rent would be

$304,000 for that November 2011 to June 2012 period.

The problem, however, is that Slominski did not have full use and control of

the land for that whole period.   At most, he had five full months of usage to which

the full rent applies.   That total is $204,165.   The Court believes Slominski had

essentially half-control of the land the next two months (April and May), and

half-rent is $20,416 per month for a total of $40,833 for those two months.   Because

he had the property until June 15, 2012, the Court will take the $20,416 and divide it

in half for $10,208.   All totaled, Slominski owes $255,200 for 2012 instead of

$304,000.   The $255,200 amount takes into account that Slominski did not have full

possession and control of the land for a portion of 2012 after the Court awarded

Trustee full authority over the crop land in mid-March 2012.

Slominski thus owes $745,200 total for rent in 2011 ($490,000) and part of

2012 ($255,200).   Slominski testified at this hearing that he already paid Trustee

the $314,000 he was holding on the 2011 lease and should be credited for that

payment.   After that deduction, Slominski still owes $431,200 to Trustee for rent

and the KGLP properties.

Slominski's net award is the amount he claims for crop expenses, minus the

amount of rent due.   Slominski proved $578,577.95 in compensable expenses for

crop improvements under § 550(e)(1)(A).   He still owes $431,200 in rent for 2011–

2012.   Slominski is therefore entitled to $147,377.95 from the KGLP estate.

### E.    Pending Motions

Trustee moved for a directed verdict at the close of Slominski's case in chief.

He asserted that Slominski failed to prove that he improved the bankruptcy estate.

The conclusions reached above render this motion moot.

33

Slominski moved to reopen his case in chief for the submission of Exhibit

202.   The Court ruled that it would take the motion with the case but later received

Exhibit 202.   This motion is therefore moot.

### F.     Conclusion

The Court has considered all other arguments and deems them to be without

merit.

**SO ORDERED.**

Dated this 7th day of October,  2013.

**THAD J. COLLINS
BANKRUPTCY JUDGE
SITTING BY DESIGNATION**